IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| JENNIFER HAILES,<br><br>Plaintiff,<br><br>vs.<br><br>SECRETARY OF DEPARTMENT OF VETERANS AFFAIRS,<br><br>Defendant. | CASE NO. 1:24-cv-293<br><br>MAGISTRATE JUDGE JAMES E. GRIMES JR.<br><br>**MEMORANDUM OPINION AND ORDER** |

Pro se Plaintiff Jennifer Hailes and Defendant Secretary of the Department of Veterans Affairs have filed cross motions for summary judgment on Hailes's federal-sector, Title VII retaliation claim. As is discussed, the Court grants the Secretary's motion and denies Hailes's motion.

*1. Background*

Hailes has worked for the Department of Veterans Affairs, commonly known as the VA, since 2000. Doc. 53-1, at 9. During the time relevant to this action, she worked at the VA's Cleveland Medical Center, in its Pathology and Laboratory Medicine Service. *Id*. at 13, 18. The parties refer to Pathology and Laboratory Medicine Service as PALMS.[1] While employed with PALMS, Hailes worked as a microbiology medical technologist. *Id*. at 13.

---

1 The use of acronyms and initialisms, seemingly designed to help only the author and hinder the reader, has unfortunately proliferated in the legal profession. *See* Bryan A. Garner, *Garner's Modern English Usage* 3–4 (4th ed. 2016) (discussing *initialese*). And this case involves the Government, the

From 2013 through November 2020, Hailes's supervisor was Tracey Ellis-Reid. *Id.* at 13–14, 19. Hailes viewed Ellis-Reid as a mentor. *Id.* at 15. For Ellis-Reid's final performance appraisal of Hailes, for the period from October 2019 to September 2020, Ellis-Reid rated Hailes's actual achievement as exceptional—the top of three categories—in all five appraisal elements. Doc. 52-1, at 7. And Ellis-Reid rated Hailes's overall performance as outstanding—the highest of five possible ratings. *Id.* at 9.

As it turns out, Ellis-Reid was generous in her ratings. Including Hailes, she rated five medical technicians. She gave four of her subordinates, including Hailes, outstanding overall performance ratings. Doc. 54-4. One subordinate received an excellent. *Id.*

Following Ellis-Reid's retirement, Hailes's supervisor from November 2020 through April 2022, was Natalyia Kachaluba. *Id.* at 19. Things did not go well between Hailes and Kachaluba. *See* Doc. 54-3 (detailing incidents from March through June 2021).

In March 2021, Hailes filed a union grievance having to do with a "failure to interview or promote." Doc. 53-1, at 46–47. In that month, she also filed a complaint with the Equal Employment Opportunity Commission (the Commission) alleging claims of racial discrimination, "failure to promote," and

country's largest producer of initialisms and sometimes unpronounceable acronyms. So the use of initialisms and acronyms is, with apologies, unavoidable here.

retaliation. *Id*. at 47–48. For clarity, neither of these complaints is related to Hailes's retaliation claim here. *See id*. at 47–49.

In May 2021, Kachaluba issued Hailes her mid-year progress review. *See* Doc. 52-5. Kachaluba gave Hailes an overall rating of "Fully Successful or better," and rated Hailes's actual achievement as fully successful—the middle of three categories—in all five appraisal elements. *Id*. at 7–8.

In June 2021, Hailes filed a complaint through the VA's Harassment Protection Program (HPP). *Id*. at 49–50; *see* Doc. 54-3. According to a fact-finding report completed following an investigation prompted by Hailes's complaint, Hailes alleged that after she filed her Equal Employment Opportunity complaint, Kachaluba began harassing Hailes and treating her unfairly. Doc. 54-3, at 1. During her deposition in this case, Hailes testified that her HPP complaint alleged that Kachaluba "over-scrutiniz[ed]" Hailes's "work[,] … asked [Hailes] to work outside of standard operating procedures[,] and issued errors when [Hailes] refused [an] unlawful order." Doc. 53-1, at 49. As to this latter point, Hailes testified that to maintain its accreditation, her lab at the VA had to follow certain standard operating procedures. *Id*. at 30–31. Hailes testified that no one is permitted to deviate from these procedures "unless the deviation is in writing and signed and approved by the medical director." *Id*. at 31. In Hailes's view, Kachaluba deviated from those procedures "to issue [Hailes] illegitimate errors in [Hailes's] performance." *Id*. at 31–33.

An investigator "found no evidence to support harassment by way of Ms. Kachaluba toward Ms. Hailes." Doc. 54-3, at 4.

On June 12, 2021, Kachaluba emailed two other VA officials forwarding three proposed disciplinary Reports of Contact related to Hailes and asked the other officials to review the proposed reports and let Kachaluba "know if anything need[ed] to [be] added or change[d]." Doc. 52-4, at 4. One official responded on June 14, 2021, with suggestions. *Id*. The other responded the next day, June 15, to report that she had spoken with the vice president of the employees' union, who had explained what a supervisor "needs" to do when issuing a Report of Contact. *Id*. at 8. Late in the day on June 15, the person assigned to investigate Hailes's HPP complaint first notified Kachaluba about the complaint. Doc. 52-3, at 5–7. The next day, June 16, 2021, Kachaluba signed a Report of Contact in which Kachaluba documented that Hailes failed to follow certain laboratory procedures for three patients' reports. Doc. 52-4, at 5. Kachaluba added that she had "spoken" "multiple times" with Hailes about "properly" "reporting … patient reports" and "following" "established" "procedures." *Id*. Kachaluba considered Hailes's conduct to be "direct insubordination." *Id*. Hailes received the document on June 24, 2021. *Id*. at 4.

"[A]round the same time" that Hailes filed her HPP complaint, she also filed a complaint with the VA's Office of Inspector General. Doc. 53-1, at 50. Hailes alleged that "verbal deviations from" PALMS standard operating procedures presented a "risk to patient safety." *Id*. The Inspector General's

office "opened a case based on" Hailes's complaint in early July 2021. Doc. 52-3, at 10. The record does not directly reveal the result of any Inspector General investigation that may have resulted from Hailes's complaint, but Hailes testified that she "received an email [indicating] that it was closed." *Id*. at 50–51. Dr. Mohamed Ansari, the chief of PALMS, learned about the Inspector General complaint during a meeting with the HPP investigator in July or August 2021. Doc. 53, at 51–52.

Although Hailes apparently later filed other complaints, *see id*. at 53–54, only her HPP and Inspector General complaints are relevant to the retaliation claim that Hailes brings in this case, *id*. at 48, 51.

In November 2021, Kachaluba issued Hailes's performance appraisal for the period October 2020 through September 2021. Doc. 52-5. Kachaluba gave Hailes an overall performance rating of fully successful and rated her as fully successful—the middle of three choices—in all five rating elements. *Id*. at 7–9. In other words, Kachaluba rated Hailes the same as she'd rated Hailes in Hailes's mid-year review, issued in May.

It turns out the Kachaluba was less generous in her ratings than Ellis-Reid. Of Kachaluba's seven subordinates, only one received an outstanding rating and six—including Hailes—received a fully successful rating. Doc. 54-5, at 1. Kachaluba thus rated as fully successful all four of the medical technicians whom Ellis-Reid had rated as outstanding. *Compare* Doc. 54-4, *with* Doc. 54-5.

On Friday, November 26, 2021, which was the day after Thanksgiving, Hailes emailed Mayra Rosado, laboratory manager and assistant chief of PALMS, to contest her evaluation. Doc. 52-7, at 4. Rosado forwarded Hailes's email to Dr. Maria Navas, who was the microbiology laboratory director. *Id.* at 3. On Tuesday, November 30, 2021, Kachaluba emailed Dr. Navas for a statement about an incident that had occurred in August 2021 during a staff meeting. *Id.* Dr. Navas responded later that day. *Id.* at 2. In her email, she said that during the staff meeting, Hailes "lashed out aggressively against" Kachaluba and "against other 'categorical' techs and made several inflammatory statements raising her voice and standing up." *Id.* According to Dr. Navas, Hailes's "attacks" caused two recently hired technicians to cry. *Id.*

In early January 2022, Hailes asked Kachaluba whether she could "be removed from training or any situations that [would] require [Hailes] to be alone with" a particular co-worker. Doc. 53-1, at 105–06. Hailes explained that because of false accusations made against Hailes, she "no longer felt comfortable … being in situations with [that co-worker] where there were no witnesses present." *Id.* at 106. Kachaluba responded "that if [Hailes] wanted to be removed from training" her co-worker, then Hailes "needed to put it in writing and send it to [Kachaluba] in an email." *Id.* at 107.

Hailes then emailed Kachaluba with her request. *Id.* Shortly after Hailes emailed Kachaluba, Hailes encountered Kachaluba in a hallway. *Id.* at 108. Kachaluba approached Hailes and "put[] her hand in [Hailes's] face and"

said that if Hailes "want[ed] to be removed from training … it's going to be negatively reflected against you on your performance." *Id*. at 108–09; *see* Doc. 52-10, at 3. While saying this to Hailes, Kachaluba "was very aggressive and in [Hailes's] face and yelling and pointing her finger at [Hailes]." Doc. 53-1, at 109.

During her deposition, Hailes was asked whether she ever completed work as directed by Kachaluba that was outside the standard operating procedures. *Id*. at 111. Hailes said that she did start doing that in early 2022 because she "had no choice." *Id*. Hailes then added that:

> I fell in line, if you will, because the environment was so hostile and the harassment was so intense. I mean, I was in therapy and on medication because of this.
>
> I know that I wasn't—after it got to that point, I wasn't the only one that she was doing that [to] anymore. I was just the only one that was refusing it.
>
> In the depositions that I took of the other coworkers, they admit—even in the [Commission administrative] judge's analysis for his summary judgment he said, it is evident that [Kachaluba] does this with everyone, deviates from SOPs, and called me insubordinate because I'm the only one who refused to break the law. Everybody else did it because of their fear of reprisal.

*Id*. at 111–12.

Later in January 2022, Hailes filed a second complaint with the Commission.[2] *See id.* at 54; Doc. 52-11, at 73. Hailes claimed that she "was subjected to reprisal/retaliation for her prior EEO activity." Doc. 52-11, at 73. She claimed that Kachaluba twice retaliated against her:

> 1. On November 24, 2021, … Kachaluba … issued [Hailes] lower job elements and an overall performance appraisal rating at the "fully successful" level based on unjustified alleged deficiencies, that barred her from a performance award, and after Mayra Rosado …, Assistant Chief, Pathology & Laboratory Medicine Service, refused to intervene or change the rating; and
>
> 2. On January 4, 2022, [Kachaluba] yelled at, threatened and/or verbally admonished [Hailes] about the lab work schedule and for [Hailes's] request to be removed from training a co-worker with whom [Hailes] had previous issues.

*Id.* at 74. A Commission administrative judge adjudicated Hailes's claims and, in February 2024, granted the VA's motion for summary judgment. *Id.* at 73–105.

Hailes filed this action later in February 2024. Doc. 1. In the operative, amended complaint, Hailes raises a single claim under Title VII for retaliation. Doc. 7, at 7–8. She alleges that she complained to the Commission, the VA's Office of Inspector General, her union, human resources, and senior officials in her office "about her supervisor[']s practice of requiring the staff to perform

---

[2] Hailes asserts that she filed her second Commission complaint in December 2021. *See* Doc. 52, at 7. But she doesn't cite anything to support that assertion.

work outside of Standard Operating Procedures." *Id.* at 7. Hailes allegedly "also filed a complaint when she noticed an unqualified employee being interviewed for a position and to protest [Hailes's] failure to qualify for the same position." *Id.* Hailes's supervisor, Kachaluba, knew about these "protected EEO actions." *Id.* Following Hailes's actions, she was "harassed, yelled at, and discriminated against by her supervisors, blamed for creating division in the lab, written up, accused of causing laboratory contaminations, removed from specialized duties, and given lower performance ratings." *Id.* at 8. And Hailes's "supervisors intentionally cancelled a position for which [Hailes was] qualified and applied for." *Id.* According to the amended complaint, these actions amounted to retaliation for having opposed an unlawful employment practice. *Id.* Hailes seeks declaratory judgment, back-pay, compensatory and punitive damages, and attorney fees and costs. *Id.*

*2. Legal Standards*

*2.1 Summary Judgment*

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party may, but is not required "to[,] produce evidence showing the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). As the rule says, the moving party may "discharge[]" its

burden "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.*

A party asserting that a fact is in genuine dispute, i.e., the party opposing summary judgment, must do more than simply say that it is so. *See Bennett v. Louisville Metro Gov't*, 616 F. App'x 820, 823 (6th Cir. 2015); Fed. R. Civ. P. 56(c)(1). Rather, a party asserting that there is a genuine dispute must support her assertion with "cit[ations] to *particular parts* of materials in the record" or she must show either that her opponent's evidentiary "materials … do not establish the absence … of a genuine dispute, or that [the movant] cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1) (emphasis added); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). And "[i]f a party … fails to properly address another party's assertion of fact …, the court" has the discretion to "consider the fact undisputed for purposes of the motion" and, if otherwise appropriate, grant summary judgment. Fed. R. Civ. P. 56(e); *see Ghandi v. Police Dep't of City of Detroit*, 747 F.2d 338, 345 (6th Cir. 1984) ("Plaintiffs … are not entitled 'to get to the jury on the basis of the allegations in their complaints, coupled with the hope that something can be developed at trial'") (quoting *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289–90 (1968)).

Because Hailes is unrepresented, the Court is obligated construe liberally her pleadings and filings. *Boswell v. Mayer*, 169 F.3d 384, 387 (6th Cir. 1999). This liberal-construction requirement, however, "do[es] not apply

after a case has progressed to the summary judgment stage." *Johnson v. Stewart*, No. 08-1521, 2010 WL 8738105, at *3 (6th Cir. May 5, 2010) (citations omitted). A party's pro se status, therefore, does not mean that Rule 56's requirements do not apply. *See Viergutz v. Lucent Techs., Inc.*, 375 F. App'x 482, 485 (6th Cir. 2010). In opposing the VA's summary judgment motion, therefore, Hailes "'may not rely merely on allegations or denials in [her] own pleading; rather, [her] response must—by affidavits or … otherwise…—set out specific facts showing a genuine issue for trial.'" *Id.* (quoting Fed. R. Civ. P. 56(e)(2)); *see Myers v. Shelly Co.*, No. 24-cv-0792, 2026 WL 653640, at *3 (N.D. Ohio Mar. 9, 2026); *see also Zainalian v. Memphis Bd. of Educ.*, 3 F. App'x 429, 431 (6th Cir. 2001) (affirming a grant of summary judgment, noting that because the pro se plaintiff "neither verified his affidavit nor complaint, signed them under oath, nor signed them under penalty of perjury ..., the facts averred to therein lacked the force and effect of an affidavit for purposes of responding to a motion for summary judgment").

*2.2 Employment Discrimination and Retaliation*

Title VII prohibits an employer from "discriminat[ing] against any individual with respect to [the individual's] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Because a similar prohibition applies in the case of federal employees, *see* 42 U.S.C. § 2000e-16(a), it is apparent that sovereign immunity does not bar Title VII claims

against government agencies, *see Taylor v. Geithner*, 703 F.3d 328, 333 (6th Cir. 2013). Title VII prohibits an employer from retaliating against an employee "because [s]he has opposed any practice made an unlawful employment practice by [Title VII], or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a); *see Hamm v. Pullman SST, Inc.*, 167 F.4th 382, 392 (6th Cir. 2026). This anti-retaliation provision applies to federal employees like Hailes. *See Taylor*, 703 F.3d at 335–36; *see also Zickefoose v. Austin*, No. 2:22-cv-1935, 2023 WL 7167001, at *4 (S.D. Ohio Oct. 31, 2023) (noting that although "the federal-sector [Title VII] provisions contain no separate, express prohibition on retaliation .... it seems inescapable that the prohibition on retaliation that the Supreme Court located in the federal-sector ADEA's language in [*Gomez-Perez v. Potter*, 553 U. S. 474 (2008)] would apply equally to Title VII's federal-sector provisions").

To establish a prima facie retaliation claim, a plaintiff must establish that (1) she "engaged in protected activity"; (2) her employer knew of her protected activity; (3) the employer took a "materially adverse employment action" against her; and (4) a causal connection existed between the protected activity and the materially adverse employment action. *Crisp v. Scioto Ambulance Dist.*, 182 F.4th 490, 494 (6th Cir. 2026). The third element can alternatively be satisfied by showing that the employer "subjected the plaintiff to severe or pervasive retaliatory harassment by a supervisor." *Wyatt v. Nissan*

*N. Am., Inc.*, 999 F.3d 400, 419 (6th Cir. 2021). *Materially adverse* means "'significant' harm." *Muldrow v. City of St. Louis, Missouri*, 601 U.S. 346, 357 (2024). To prove a Title VII retaliation claim in a federal-sector case, a plaintiff seeking "'reinstatement, backpay, compensatory damages, or other forms of relief related to the end result of an employment decision'" must show that her protected activity "was the but-for cause of the [adverse] employment decision." *Zickefoose*, 2023 WL 7167001, at *4; *see Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013). This *but-for* requirement means that a plaintiff "must 'put forth some evidence to deduce a causal connection between the adverse action and protected activity,' that is 'sufficient to raise the inference' that the discrimination or 'protected activity was the likely reason for the adverse action.'" *Pemberton v. Bell's Brewery, Inc.*, 150 F.4th 751, 767 (6th Cir. 2025) (discussing retaliation under the Americans with Disabilities Act) (citations omitted); *see Penny v. United Parcel Serv.*, 128 F.3d 408, 417 (6th Cir. 1997) ("Retaliation claims are treated the same whether brought under the ADA or Title VII.").

But if the plaintiff in a federal-sector Title VII retaliation case seeks forward-looking relief, the *but-for* standard does not apply. *See Zickefoose*, 2023 WL 7167001, at *4. Rather, the plaintiff need only show that the protected activity "played a part in" the employer's adverse action. *Huff v. Buttigieg*, 42 F.4th 638, 645 (7th Cir. 2022); *Zickefoose*, 2023 WL 7167001, at *4.

If an employee lacks direct evidence, the Court will "follow the same [*McDonnell Douglas*] burden-shifting approach in [the] retaliation context that" applies "in the discrimination context." *See Hamm*, 167 F.4th at 393; *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973); *Seifu v. Postmaster Gen. of United States*, No. 21-4068, 2022 WL 19835788, at *3 (6th Cir. Dec. 12, 2022) (applying the *McDonnell Douglas* framework in a federal-sector Title VII retaliation case). Applying this burden-shifting framework means that the employee "must [first] establish a prima facie case of retaliation." *Hamm*, 167 F.4th at 393. If she makes that showing, the burden shifts to the employer "to identify a 'legitimate, nondiscriminatory reason' for" the adverse employment action. *Id*. (quoting *Kenney v. Aspen Techs., Inc*., 965 F.3d 443, 448 (6th Cir. 2020), *in turn quoting McDonnell Douglas*, 411 U.S. at 802)). If the employer does that, the burden shifts back to the employee, who must "introduce evidence that would allow a reasonable jury to find that [the employer's] identified reason for" the adverse employment action] was 'a mere pretext' for its real reason: [the employee's protected] complaint." *Id*. (quoting *Kenney*, 965 F.3d at 448)

*3. Discussion*

*3.1 Exhaustion and Time Limitations*

Hailes is a federal employee. When it allowed "federal employees to sue under Title VII, Congress conditioned the government's waiver of sovereign immunity upon a plaintiff's satisfaction of 'rigorous administrative exhaustion

requirements and time limitations.'" *McFarland v. Henderson*, 307 F.3d 402, 406 (6th Cir. 2002) (quoting *Brown v. Gen. Servs. Admin.*, 425 U.S. 820, 833 (1976)). As a prerequisite to filing a Title VII discrimination or retaliation case against an employer, a federal employee "must contact an Equal Employment Opportunity ('EEO') counselor within forty-five days of an alleged discriminatory occurrence."[3] *Steiner v. Henderson*, 354 F.3d 432, 435 (6th Cir. 2003); *see* 29 C.F.R. § 1614.105(a)(1). "Failure to do so is cause for dismissal of the complaint by the agency, as well as by the district court." *Steiner*, 354 F.3d at 435; *see* 29 C.F.R. § 1614.107(a)(2); *see also* 29 C.F.R. § 1614.107(b) (permitting the Commission to dismiss fewer than all claims). The upshot of these requirements is that a Court can only consider allegedly retaliatory conduct that occurs within the 45-day window that precedes a plaintiff's contact with her agency's Equal Employment Opportunity office. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002) ("discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act."); *see also Qafko v. Nielsen*, No. 17-cv-

---

3 As a general matter, retaliation claims are "excepted from [the exhaustion] requirement because they usually arise after the filing of the EEOC charge." *Abeita v. TransAmerica Mailings, Inc.*, 159 F.3d 246, 254 (6th Cir. 1998). But "this exception to the filing requirement does not apply to retaliation claims based on conduct that occurred before the EEOC charge was filed." *Id*. Hailes's claims predate her second EEOC claim, which alleged retaliation.

13916, 2018 WL 2194017, at *2 (E.D. Mich. May 14, 2018) (applying *Morgan* in the federal-employment context).

"As a general rule, a Title VII plaintiff cannot bring claims in a lawsuit that were not included in her EEOC charge." *Lybarger v. Gates*, No. 10-cv-0373, 2012 WL 1095915, at *7 (N.D. Ohio Mar. 30, 2012) (citing 42 U.S.C. § 2000e–5(e)(1)); *see Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 361 (6th Cir. 2010). In other words, the employee's federal lawsuit cannot include claims that were not presented to the Commission unless the claims are "reasonably related to or grow out of the factual allegations in the EEOC charge." *Younis*, 610 F.3d at 361–62; *see Lybarger*, 2012 WL 1095915, at *7.

Once a Commission administrative judge issues a decision, the respondent agency has 40 days to take final action on that decision. *See* 29 C.F.R. § 1614.110(a). If the agency does not take final action within 40 days, "then the decision of the administrative judge shall become the final action of the agency." 29 C.F.R. § 1614.109(*i*).

Here, Hailes has not exhausted her administrative remedies. She filed this action within days after the Commission's administrative judge issued his decision, but well before the expiration of the VA's time to take final action. Except in response to Hailes's effort to expand her claim beyond what was presented to the Commission, however, *see* Doc. 57, at 6, 9 & n.2, Doc. 58, at

2,[4] the VA has not sought to enforce the exhaustion requirement. So Hailes's failure to fully exhaust her claim need not detain the Court in considering the claims that the Commission's administrative judge adjudicated. *See Fort Bend Cnty., Texas v. Davis*, 587 U.S. 541, 551–52 (2019).

*3.2 Merits*

The Court's review has been hampered by the different ways that the parties have failed to follow this Court's summary judgment procedures. *See* Doc. 22-1. First, neither moving party filed a joint statement of stipulated facts. *See id*. at 1. Second, neither party filed "a separate, short and concise statement of material facts." *Id*. And although Hailes submitted a statement of material facts, she incorporated it into her memorandum. Doc. 52, at 1–7. Further, while the parties were required to support "[e]ach asserted fact" with a "citation to the specific evidentiary material, including the specific page number, that supports it," *id*, at 2, Hailes only intermittently provided supporting citations.[5]

---

[4] When citing the parties' motions and supporting memoranda, the Court cites the CM/ECF-generated pages numbers at top of each page.

[5] For instance, Hailes does not support her assertions that: (1) she was "declared ineligible for [an] interview" for a position as a "GS-11 Clinical Microbiology Technical Specialist"; (2) she filed corrective reports and non-conforming events as to a co-worker who she thought was unqualified for the co-worker's position; (3) the co-worker was promoted; or (4) the co-worker received "the highest annual performance rating of Exceptional … and the highest overall rating of Outstanding." Doc. 52, at 3–4, 6.

Because the parties were warned that their failure to follow the Court's summary judgment procedure could "be grounds for denial of [their] motion[s]," *id.* at 1, the Court could deny both motions. But, in the interest of securing a "just, speedy, and inexpensive determination," Fed. R. Civ. P. 1, the Court will put these failings aside and adjudicate the parties' motions while applying Rule 56.

*3.2.1 What is this case about?*

At the outset, it is necessary to spell out what this action is—and is not—about. Hailes at times seems to conflate this case with others in which she raised discrimination claims. For instance, Hailes argues that she was subject to disparate treatment compared to a Hispanic co-worker. Doc. 52, at 17–18. While disparate treatment is an element of a discrimination case, it is not an element of a retaliation case. And Hailes references the August 2021 staff meeting as evidence of retaliation. Doc. 52, at 10. But the events surrounding that meeting were "part of [Hailes's] prior EEO" complaint, Doc. 53-1, at 52, *see* Doc. 10-1, at 4, 8, which she resolved through settlement.

Recall that the contours of a Title VII suit are framed by the claim raised in the predicate complaint to the Commission. *Younis*, 610 F.3d at 361–62. And the claim that Hailes raised with the Commission as to this lawsuit was for retaliation. *See* Doc. 52-11, at 73–74 & n.3. Indeed, the Commission's administrative judge noted that Hailes had clarified in various ways "that she [was] exclusively alleging retaliation … and not race discrimination." *Id.* at 73–

74 n.3. And Hailes's amended complaint raises a single claim of retaliation not discrimination. Doc. 7, at 7. This case is thus about allegations of retaliation.[6]

But retaliation for what? Answering this question is not straightforward. In the amended complaint, Hailes says that the retaliation resulted from her internal complaints that (1) "her supervisors … require[ed] the staff to perform work outside of Standard Operating Procedures"; (2) "an unqualified employee [was] interviewed for a position"; and (3) Hailes "fail[ed] to qualify for th[at] same position." Doc. 7, at 7. In her motion for summary judgment, Hailes says that the retaliation was triggered by her HPP complaint, her "refusal to obey unlawful orders, and for [her] reporting of receiving unlawful orders to outside [a]gencies." Doc. 52, at 8. But in her opposition to the VA's motion for summary judgment Hailes says that the retaliation was triggered by her first Equal Employment Opportunity complaint in March 2021, and her HPP complaint in June 2021. Doc. 56, at 3–5.

Given the above-noted ambiguity, the most appropriate and fair course is to take Hailes at her word. During her deposition, Hailes denied that her March 2021 Equal Employment Opportunity complaint "is the protected activity[]" that triggered the retaliation "in this case." Doc. 53-1, at 48. Instead, "the retaliation for this case is based off the HPP complaint that [she] filed in

[6] In her opposition to the VA's motion, Hailes makes a passing reference to constructive discharge. Doc. 56, at 8. An opposition to a motion for summary judgment is not the place to raise for the first time a new claim.

June of … 2021" and her Inspector General complaint. *Id*. at 48–50. And Hailes views that HPP complaint as being based on "the over-scrutinization of [her] work, as well as [her] being asked to work outside of standard operating procedures and issued errors when [she] refused the unlawful order." *Id*. at 49. Hailes's case is thus based on the allegation that she suffered retaliation for filing her HPP and Inspector General complaints. *Cf.* Doc. 54-1, at 2–3. (VA motion for summary judgment relying on Hailes's deposition testimony to frame the bases for Hailes's retaliation claim).

In framing the issues before the Court, the next question has to do with the acts that Hailes alleges constitute retaliation. Once again, matters are not straightforward. The acts that Hailes alleged to the Commission as being retaliatory were Kachaluba's November 2021 performance appraisal of Hailes and the January 2022 incident in which Kachaluba yelled at Hailes in a workplace hallway. *See id*. at 73–74.

Hailes, however, seemingly references other incidents. In her motion, she asserts that the acts of retaliation:

> *include*[] but [are] not limited to abolishment during an all-staff meeting, threats of retaliatory disciplinary actions, harassment, defamation of character, unsubstantiated errors issued in bench performance and records & reporting, and through the lowering of Plaintiff's annual performance rating.

Doc. 52, at 10 (emphasis added). Aside from Hailes's November 2021 performance rating, the VA claims that the remainder of these matters are not

part of Hailes' retaliation claim because they occurred more than 45 days before Hailes contacted an Equal Employment Opportunity counselor. Doc. 57, at 5; *see Steiner*, 354 F.3d at 435; 29 C.F.R. §§ 1614.105(a)(1), 1614.107(a)(2), (b).

The problem with this assertion is that the 45-day requirement is an affirmative defense "on which [the VA] bears the ultimate burden of proof." *Rembisz v. Lew*, 590 F. App'x 501, 503 (6th Cir. 2014); *Lockett v. Potter*, 259 F. App'x 784, 786 (6th Cir. 2008). And although the record shows that Hailes filed her second Commission complaint—the one that served as a precursor to this action—sometime in January 2022, the 45-day window is not tied to when Hailes filed her Commission complaint; it's tied to when she first contacted an Equal Employment Opportunity counselor. The record, however, doesn't show when Hailes contacted a counselor.

Taking the referenced events in turn, "abolishment during an all-staff meeting" apparently refers to the staff meeting between microbiology staff and Dr. Ansari and Dr. Navas that the amended complaint alleges took place in August 2021. Doc. 7, at 6. Hailes references this meeting in the statement of facts section of her motion. Doc. 52, at 5. She asserts that Dr. "Navas … openly yelled at and verbally threatened" her at this meeting, *id.*, and later cites a co-worker's sworn declaration, which generally supports Hailes's assertions about the meeting, *see* Doc. 52, at 14 (citing Doc. 52-10, at 2–3). As noted above, however, this event is part of Hailes's other Commission complaint, which she

resolved through settlement. It is thus relevant here only as it relates to Hailes's performance evaluation.

The asserted "threats of retaliatory disciplinary actions" is unmentioned in the statement of facts in Hailes's motion. *See* Doc. 52, at 1–7. And without a supporting citation, there is also no basis to consider what these "threats" might entail.

"[D]efamation of character" appears to reference Dr. Navas's November 30, 2021 email to Kachaluba about Dr. Navas's recollection of Hailes's actions during the August staff meeting. *See id.* at 6. Without supporting citation, Hailes "states [that] Navas'[s] allegations" in her email to Kachaluba "were both slanderous, libel, and defamed the Plaintiff's professional character." Doc. 52, at 6. While there is no dispute that there was a staff meeting in August 2021, Hailes's bald, unsupported statement that Dr. Navas's allegations were defamatory is not enough to make the allegations defamatory. *See Zainalian*, 3 F. App'x at 431. So the most that can be said is that Dr. Navas recounted to Kachaluba what Dr. Navas remembered about the meeting. More on this email below.

"[U]nsubstantiated errors issued in bench performance and records & reporting" is ambiguous. It seemingly references the asserted facts that:

> In June of 2021, Kachaluba, Rosado, Dixon, and Robbins conspired to issue the Plaintiff unsubstantiated a ROCs for alleged failures to follow standard operating procedures when verbally instructed to deviate from written SOP. Which included management officials of other departments

> taking turns adding details and encouraging others to "embellish" more on their allegations against the Plaintiff. (See Ex. D, pgs.9-10).

Doc. 52, at 4. The cited pages include a draft disciplinary memorandum from Kachaluba to Hailes and a June 18, 2021 email from a VA official to Kachaluba saying, "I went ahead and filled this out a bit. Please feel free to embellish if you feel it is necessary . . ." Doc. 52-4, at 10–11.[7] The draft, however, is neither signed nor dated and, according to Hailes's deposition testimony, was never issued. Doc. 53-1, at 85–87. Neither cited page shows that anyone issued Hailes "unsubstantiated errors."

On the other hand, in the next paragraph of her motion, Hailes cites earlier pages in Document 52-4. *See* Doc. 52, at 4. These pages concern email exchanges between Kachaluba and others starting on June 12, 2021, regarding a Report of Contact that Kachaluba ultimately issued to Hailes a few days later. *See* Doc. 52-4, at 4–9. Liberally construing Hailes's motion, the Court regards the reference to "unsubstantiated errors" as concerning these email exchanges and the issued Report of Contact.

Hailes, however, did not present these "unsubstantiated errors" as a separate act of retaliation for her HPP or Inspector General complaints. *See* Doc. 52-11, at 73–74. And with good reason. The email exchanges between Kachaluba and others started on June 12, 2021, which was before both Hailes's

---

[7] What Hailes cites as pages "9–10" in "Ex. D" are pages 10 and 11 in Document 52-4.

HPP and Inspector General complaints. The "unsubstantiated errors" could not have been motivated by Hailes's later HPP and Inspector General complaints

So the alleged acts of retaliation that have an apparent basis in the record are Hailes's performance review, Dr. Navas's email to Kachaluba, and the January 2022 hallway incident.[8]

To recap, as presented, Hailes alleges that after she filed her HPP and Inspector General complaints, she suffered retaliation, as evidenced by Hailes's performance review, Dr. Navas's email, and the January 2022 hallway incident.

*3.2.2 For summary-judgment purposes, Hailes's HPP complaint constitutes protected activity*

With the issue framed, it bears remembering that the parties have cross-moved for summary judgment. The standard for evaluating cross motions for summary judgment does not differ from the standard applied when only one party to the litigation moves for summary judgment. *Ferro Corp. v. Cookson Group, PLC*, 585 F.3d 946, 949 (6th Cir. 2009). As a result, each party's motion must be evaluated "'on its own merits,'" and the Court must view all facts and reasonable inferences in the light most favorable to the nonmoving party. *Id.* at 949–50 (quoting *Taft Broad. Co. v. U.S.*, 929 F.2d 240, 248 (6th Cir. 1991)). Here, however, the relevant facts are, unless noted, not in dispute. And even

---

8 Hailes mentions the hallway incident in her statement of facts. Doc. 52, at 7. And it was one of the two acts considered by the Commission.

viewing all of Hailes supported assertions in the light most favorable to her, she hasn't presented evidence sufficient to support her claim.

As noted, a prima facie case of retaliation has four elements. Hailes must show that: (1) she engaged in protected activity; (2) the VA knew of her protected activity; (3) the VA took an action that was adverse to her; and (4) a causal connection existed between the protected activity and the materially adverse action. *Wyatt*, 999 F.3d at 419. As an initial matter, Hailes's claim that she engaged in protected activity is problematic. *Protected activity* under Title VII, means either (1) "oppos[ing] any practice made an unlawful employment practice' by Title VII or (2) "ma[king] a charge, testif[ying], assist[ing], or participat[ing] in any manner in an investigation, proceeding, or hearing" under Title VII. 42 U.S.C. § 2000e–3(a). Title VII, however, "is not a general bad acts statute ... and it does not prohibit ... employers from retaliating against an employee based on her opposition to ... practices that are outside the scope of Title VII." *Bonds v. Leavitt*, 629 F.3d 369, 384 (4th Cir. 2011). So, "a complaint of general misconduct by a supervisor, unrelated to the complainant's race, color, gender, religion, or national origin, is not activity protected by Title VII." *Burns v. Johnson*, 18 F. Supp. 3d 67, 73 & n.45 (D. Mass. 2014); *see Shed v. Univ. of S. Fla. Bd. of Trs.*, No. 23-13746, 2025 WL 1540573, at *4 (11th Cir. May 30, 2025) ("Title VII does not protect against retaliation resulting from complaints about non-employment related practices.").

Start with Hailes's Inspector General complaint. The details of what was in this complaint are sparse. The Inspector General complaint is not in the record. The only description of it comes from Hailes's deposition. Hailes testified that the Inspector General complaint had to do with "verbal deviations from [standard operating procedures] that" presented a "risk to patient safety." Doc. 53-1, at 50. But complaints that Kachaluba's orders presented a "risk to patient safety," *id.*, don't qualify as protected activity because Title VII is not concerned with patient safety or whether Kachaluba was authorized to order personnel to deviate from established procedures. *See Burns*, 18 F. Supp. 3d at 73 ("a complaint of general misconduct by a supervisor, unrelated to the complainant's race, color, gender, religion, or national origin, is not activity protected by Title VII"); *see also Logan v. City of Chicago*, 4 F.4th 529, 539 (7th Cir. 2021) ("'Title VII is not a general bad acts statute'") (quoting *Crowley v. Prince George's Cnty., Md.*, 890 F.2d 683, 687 (4th Cir. 1989)). As a result, Hailes cannot base her retaliation claim on the Inspector General report.[9]

This leaves Hailes's HPP complaint. Because the HPP complaint is not in the record, the Court relies on Hailes's deposition testimony that the HPP complaint was based on "the over-scrutinization of [her] work, as well as [her]

---

[9] Hailes includes in her summary judgment motion a section in which she states that she "is a member of a protected class under Title VII." Doc. 52, at 9. Given Hailes's inclusion of this section in her motion, it may be that she believes that because she is a member of a protected class, reporting any sort of misconduct is protected activity. But proving one's status is not an element of a Title VII retaliation claim. *See Wyatt*, 999 F.3d at 419.

being asked to work outside of standard operating procedures and issued errors when [she] refused the unlawful order." Doc. 53-1, at 49. One might think that none of these matters have anything to do with what Title VII protects. *See* 42 U.S.C. § 2000e–2(a)(1); *Burns*, 18 F. Supp. 3d at 73. But the VA, which is represented by counsel, concedes that the fact that Hailes filed her HPP complaint could be considered *protected activity*. Doc. 54-1, at 6 n.1. The Court will thus proceed based on the assumption that the HPP complaint constitutes *protected activity*. *See Clark v. Sweeney*, 607 U.S. 7, 9 (2025).

*3.2.3 There is no evidence that the VA took an action materially adverse to Hailes or subjected her to severe or pervasive retaliatory harassment by a supervisor*

Because the record shows that the VA knew about Hailes HPP complaint, the next question is whether there is a genuine dispute about whether the VA took any action that was adverse to Hailes or subjected her to severe or pervasive retaliatory harassment by a supervisor. *See Wyatt*, 999 F.3d at 419. Specifically, the question is whether Hailes "fully successful" performance review, Dr. Navas's email, or the January 2022 hallway incident are adverse actions or amounted to severe or pervasive retaliatory harassment by a supervisor.

Beginning with the performance review, even assuming that a "fully successful" evaluation might qualify as sufficiently adverse or harassing, Hailes's own evidence shows that Kachaluba did not lower Hailes's performance review following the HPP complaint. The first opportunity that

Kachaluba had to review Hailes's performance was in May 2021 for Hailes mid-year progress review. *See* Doc. 52-5. Kachaluba issued this review weeks *before* Hailes filed her HPP complaint. In the mid-year review, Kachaluba gave Hailes an overall rating of "Fully Successful or better," and rated Hailes's actual achievement as fully successful—the middle of three categories—in all five appraisal elements. *Id*. at 7–8.

And in Kachaluba's November 2021 annual review of Hailes's performance—the review at issue—Kachaluba rated Hailes's overall performance as fully successful and rated her as fully successful—the middle of three choices—in all five rating elements. Doc. 52-5, at 7–9. In other words, Kachaluba rated Hailes *the same* in the annual review as in Hailes's mid-year review. So Kachaluba did not lower Hailes review after the HPP complaint.

Further, to establish a retaliation claim, a plaintiff must show that she was subject to actions that "a reasonable employee would have" viewed as "materially adverse" and that "might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)). Here, Kachaluba rated six out of her seven subordinates—including Hailes—as fully successful. In doing that, Kachaluba rated as fully successful all four of the medical technicians whom Ellis-Reid had rated as outstanding. *Compare* Doc. 54-4, *with* Doc. 54-5. Given that Kachaluba rated all of Hailes's similarly situated co-workers the same, it is not

possible without more to infer that Hailes's annual performance evaluation constituted an adverse employment action. Nor is it possible to infer based on this evidence that Hailes's evaluation amounted to severe or pervasive retaliatory harassment by a supervisor. Rather, taking this evidence in the light most favorable to Hailes, the only reasonable inference is that Kachaluba was harder to please than Ellis-Reid.[10]

Next up is Dr. Navas's email recounting her recollection of what happened at the August meeting, which Hailes alleges without support was defamatory. The VA does not regard this event as a separate alleged retaliatory event, largely because the Commission's administrative judge didn't list it as a retaliatory event. Doc. 54-1, at 8, 11. In opposing the VA's motion, Hailes does not dispute the VA's position. *See* Doc. 56. Rather, she mentions alleged "defamation" as a factor in the causation and pretext analysis. *Id*. at 9–10. So there is no real dispute that the email is not an adverse action.

But even giving Hailes the benefit of the doubt and even when viewed in the light most favorable to Hailes, no evidence supports the idea that Dr. Navas's email was an adverse action or an example of severe or pervasive

---

10 The VA also argues that "the Sixth Circuit has repeatedly held that unsatisfactory work reviews, absent some loss in salary, title, or benefits, do not rise to the level of a materially adverse employment action." Doc. 54-1, at 12. But the cases on which it relies to support this assertion deal with discrimination claims. *See id.* "The 'materially adverse action' element of a Title VII retaliation claim is," however, "substantially different from the 'adverse employment action' element of a Title VII race discrimination claim." *Laster v. City of Kalamazoo*, 746 F.3d 714, 719 (6th Cir. 2014).

retaliatory harassment. Recall that although Hailes asserts that Dr. Navas's recollection was defamatory, there's no evidence that it was. And other than asserting it, Doc. 52, at 17, Hailes does nothing to show that a supervisor's email—sent in this case *after* Kachaluba issued Hailes's performance review—recounting an event would be viewed as "materially adverse" such that it "might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington*, 548 U.S. at 68. Indeed, since Dr. Navas didn't send the email to Hailes and Hailes didn't learn about it until later, there is no basis to infer that it might "dissuade[] a reasonable worker from" doing anything, let alone "making or supporting a charge of discrimination." *Id.*

This leaves the hallway incident in January 2022. Hailes testified that this incident began when she emailed Kachaluba, at Kachaluba's direction, asking "to be removed from training" Hailes's co-worker. Doc. 53-1, at 107. Soon after Hailes sent the email, Kachaluba approached Hailes and "put[] her hand in [Hailes's] face and" and said that if Hailes "want[ed] to be removed from training … it's going to be negatively reflected against you on your performance." *Id.* at 108–09; *see* Doc. 52-10, at 3. While saying this to Hailes, Kachaluba "was very aggressive and in [Hailes's] face and yelling and pointing her finger at [Hailes]." Doc. 53-1, at 109.

The problem for Hailes with respect to this event is that "Title VII … does not set forth 'a general civility code for the American workplace.'" *Burlington*, 548 U.S. at 68 (quoting *Oncale v. Sundowner Offshore Services,*

*Inc.*, 523 U.S. 75, 80 (1998)). Unfortunately, "'a boss's yelling at an employee, subjecting the employee to unjustifiable criticism, and calling into question his or her future on the job is a common employee experience.'" *Benitez v. Tyson Fresh Meats, Inc.*, No. 3:18-cv-0491, 2022 WL 1283087, at *72 (M.D. Tenn. Apr. 28, 2022) (quoting *Slater v. Town of Exeter*, No. No. 07-407, 2009 WL 737112, at *10 (D.N.H. Mar. 20, 2009)). Simply put, while perhaps unprofessional, Kachaluba's aggressive yelling "does not constitute an adverse action." *Id.* at *73; *see Baloch v. Kempthorne*, 550 F.3d 1191, 1195, 1199 (D.C. Cir. 2008) (holding that "profanity-laden yelling" during four separate verbal altercations, including a threat "to have [employee] arrested, led out of the building in handcuffs, and jailed" were not adverse actions). There is no evidence that the hallway incident was an adverse action or amounted to severe or pervasive retaliatory harassment by a supervisor.

Hailes has failed to present evidence that would allow a factfinder to conclude or infer that she was subjected to an adverse employment action or severe or pervasive retaliatory harassment.

*3.2.4 Causal connection*

Even putting the above aside, Hailes still must demonstrate a causal connection between the HPP complaint and her November evaluation, Dr. Navas's email, and the January 2022 hallway incident. *Wyatt*, 999 F.3d at 419. A federal-sector plaintiff seeking money damages must show *but-for* causation. *Zickefoose*, 2023 WL 7167001, at *4–5. A plaintiff can do this through

'"evidence that defendant treated the plaintiff differently from similarly situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights."' *Strickland v. City of Detroit*, 995 F.3d 495, 511 (6th Cir. 2021) (quoting *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000)).

But if the plaintiff in a federal-sector Title VII retaliation case seeks injunctive or other forward-looking relief, the *but-for* standard does not apply. *See Zickefoose*, 2023 WL 7167001, at *4. Rather, the plaintiff need only show that the protected activity "played a part in" the employer's adverse action. *Huff*, 42 F.4th at 645–46; *see Zickefoose*, 2023 WL 7167001, at *4.

In this regard, the federal-sector provision in the Age Discrimination in Employment Act (ADEA) "was patterned 'directly after' Title VII's federal-sector discrimination ban." *Gomez-Perez*, 553 U.S. at 487 (quoting *Lehman v. Nakshian*, 453 U.S. 156, 167 n.15 (1981)). "[T]he Supreme Court's construction of the ADEA is [thus] the best guidance available for defining the causation standards under Title VII's federal-sector provisions." *Zickefoose*, 2023 WL 7167001, at *4. In *Babb v. Wilkie*, the Court held that ADEA's federal-sector provision did not require *but-for* causation for plaintiffs seeking forward-looking relief. 589 U.S. 399, 402, 413–14 (2020). Instead, evidence that age played a part in an employment decision is sufficient for liability. *Huff*, 42 F.4th at 645. Applying this guidance here, the *but-for* causation standard applies to claims for compensatory damages, and *Babb*'s standard applies to

forward-looking "claims for declaratory and injunctive relief and attorney's fees and costs." *Zickefoose*, 2023 WL 7167001, at *5; *see Huff*, 42 F.4th at 646; *cf. Babb*, 589 U.S. at 413–14; *Bledsoe v. Tennessee Valley Auth. Bd. of Directors*, 42 F.4th 568, 578 n.2 (6th Cir. 2022) ("To establish that he is entitled to injunctive relief, Bledsoe need only show that 'age discrimination play[ed] any part' in the decision to demote him.").

The VA's motion, which focuses on the *but-for* causation standard, necessarily only concerns Hailes's claims for monetary relief. Doc. 54-1, at 14–19. Given the time between Hailes's HPP complaint and her performance evaluation, the way Kachaluba reviewed her other subordinates, and Hailes admitted insubordination, the VA says Hailes has no evidence of causation. *Id.* at 14–19.

For her part, Hailes focuses on the time between her HPP complaint and her evaluation as evidence of causation. Doc. 52, at 10; Doc. 56, at 9. But, to be clear, there is no evidence that she was treated differently from similarly situated employees. Everyone whom Ellis-Reid rated as outstanding received from Kachaluba the same rating as Hailes. And Hailes admitted that the reason for her negative interactions with Kachaluba was that, unlike her co-workers, Hailes refused to follow Kachaluba's instructions. Doc. 53-1, at 111–12. Hailes says that those instructions were illegal. But for purposes of the

similarly situated analysis, the relevant point is that Hailes's co-workers followed Kachaluba's instructions and Hailes didn't.[11]

As to temporal proximity, there are differing lines of authority. The Sixth Circuit has "noted that temporal proximity alone is not sufficient to support a retaliation claim … and that plaintiffs generally must show temporal proximity combined with 'other compelling evidence' of retaliation to support their claims." *Howington v. Quality Rest. Concepts, LLC*, 298 F. App'x 436, 446 (6th Cir. 2008) (quoting *Nguyen*, 229 F.3d at 566). On the other hand, under this line of authority, "'there may be circumstances where evidence of temporal proximity alone would be sufficient to support [an] inference' of retaliation." *Id*. (quoting *Nguyen*, 229 F.3d at 567). If the retaliatory conduct follows within one to two days of protected activity, a court may infer causation without more evidence. *See id*. at 446–47. The cases in which a court could infer causation based solely on a temporal connection are "'limited [in] number.'" *Id*. at 447 (quoting *Mickey v. Zeidler Tool & Die Co*., 516 F.3d 516, 525 (6th Cir. 2008)); *cf. Mickey*, 516 F.3d at 523–26 (involving an "employer [who] fires an employee immediately after learning of a protected activity," although the activity occurred 12 days before). Basically, "the more that a protected activity is temporally distant from the adverse employment action, 'the more the plaintiff must supplement his claim with other evidence of retaliatory conduct to

---

11 In fact, if Kachaluba told everyone to take actions outside the standard operating procedures, there is no basis to infer that Kachaluba's orders to Hailes were based on a retaliatory motive.

establish causality.'" *Boshaw v. Midland Brewing Co.*, 32 F.4th 598, 605 (6th Cir. 2022) (quoting *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 400 (6th Cir. 2010)); *see Lemaster v. Lawrence Cnty., Kentucky*, 65 F.4th 302, 310 (6th Cir. 2023) ("In most cases," when "a plaintiff … show[s] some moderate time gap—say, a matter of months," the Court's "summary-judgment inquiry … asks whether the plaintiff has offered enough 'other evidence of retaliatory conduct' apart from this temporal proximity"). And "three months … between" protected activity and an adverse action is "a firm indicator of a lack of a causal link." *Boshaw*, 32 F.4th at 605.

Another line of authority, however, holds that being fired "just over three months after … fil[ing] a discrimination charge with the employment commission" *is* "enough to constitute sufficient evidence of a causal connection" to demonstrate a prima facie case. *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 563 (6th Cir. 2004).[12]

Here, Kachaluba learned of Hailes's HPP complaint in mid-June and issued Hailes's performance evaluation in November. Under either camp, a five-month gap is, without more, too long to allow the Court to infer causation.

---

12 *Bryson v. Regis Corp.*, 498 F.3d 561 (6th Cir. 2007) does not cleanly fit in either camp. Although there was a three-month gap between Bryson's protected activity—taking FMLA leave—and her termination, evidence revealed that Bryson's supervisor determined early in Bryson's leave period to "make sure" that "[Bryson] would not be able to keep her job when she came back." *Id.* at 565, 571.

Hailes, however, argues that the time period between her complaint and the VA's adverse action is actually three months because the evaluation that Kachaluba issued in November was for the fiscal year that ended on September 30, 2021. Doc. 56, at 5. According to Hailes, Kachaluba must have "submitted [Hailes's] lowered performance rating to [human resources] at the end of September 2021." *Id*. But Hailes provides no basis to support her suggestion that Kachaluba submitted the application at the end of September. Rather, the idea that Kachaluba prepared and submitted Hailes's evaluation as soon as the rating year ended rests on speculation. And even if the Court indulged the speculation that Kachaluba submitted the evaluation at the end of the day on September 30, that day was still over three months after Kachaluba learned of Hailes's complaint. And three-and-a-half months is too long to infer causation.[13] *See Boshaw*, 32 F.4th at 605; *cf. Singfield*, 389 F.3d at 563 (finding evidence of causation with a temporal gap of "just over three months").

Hailes has not submitted evidence that would allow a factfinder to conclude or infer that her complaints were the but-for cause of her performance evaluation, the later email, or the hallway incident.

For all the reasons stated above, even if Hailes had presented evidence to support the third element of her claim—showing an adverse employment

[13] Dr. Navas's email and the hallway incident both followed Kachaluba's issuance of Hailes's review. Necessarily, therefore, the temporal-connection analysis dooms Hailes's assertion that these events were caused by Hailes's HPP complaint.

action or severe or pervasive retaliatory harassment—the VA is entitled to summary judgment on the issue of causation as to Hailes's claims for monetary relief.

*3.2.5 The VA offers a legitimate, nondiscriminatory basis for Kachaluba's actions and Hailes has presented nothing to show that the reason for Kachaluba's actions was a pretext*

If a plaintiff without direct evidence makes out a prima facie case of retaliation, "the burden shifts to the defendant to present a legitimate, nonpretextual reason for the action." *Jones v. St. Jude Med. S.C., Inc.*, 504 F. App'x 473, 476–77 (6th Cir. 2012); *see Bashaw v. Majestic Care of Whitehall, LLC*, 130 F.4th 542, 548 (6th Cir. 2025). "If the defendant comes forward with a qualifying reason," the burden returns to the plaintiff, who "must then demonstrate that the proffered reason was a pretext, and not the real reason for the employment decision." *Jones*, 504 F. App'x at 477. On summary judgment, a plaintiff's burden on pretext is to "'produce enough evidence ... to rebut, but not disprove, the defendant's proffered rationale.'" *Id.* (quoting *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 532 (6th Cir. 2007)); *see Bashaw*, 130 F.4th at 548 ("At summary judgment, she must produce evidence that would allow a jury to reject her employer's stated reasons and infer that the real reason was retaliation."). To do that, a plaintiff can show that: "'(1) … the proffered reasons had no basis in fact, (2) … the proffered reasons did not actually motivate the employer's action, *or* (3) [the proffered reason was] insufficient to motivate the employer's action.'" *Bashaw*, 130 F.4th at 548 (emphasis added) (quoting

*Jackson v. Genesee Cnty. Rd. Comm'n*, 999 F.3d 333, 350–51 (6th Cir. 2021)). Importantly, "[e]ven if … some [of the proffered] reasons [are] pretextual, if 'at least one other is not, the defendant employer is … entitled to summary judgment.'" *Id.* at 548 (quoting *Jones*, 504 F. App'x at 477–78). "In other words, if the employer proffers a single independent nondiscriminatory reason for its conduct, that can defeat a retaliation claim." *Id.* at 549.

In trying to carry her burden on pretext, a "plaintiff must produce sufficient evidence from which the jury could 'reasonably reject [the defendants'] explanation' and infer that the defendants 'intentionally discriminated' against" her. *Braithwaite v. Timken Co.*, 258 F.3d 488, 493 (6th Cir. 2001) (citation omitted). She "must [therefore] allege more than a dispute over the facts upon which" the allegedly adverse action "was based." *Id.* at 494. Rather, the plaintiff must present evidence showing "that the employer did not 'honestly believe' in the proffered non-discriminatory reason for its adverse employment action." *Id.* When evaluating an employer's purported "honest belief," a court asks "whether the employer can establish its 'reasonable reliance' on the particularized facts that were before it at the time the decision was made." *Id.* (citation omitted). And that question turns on "'whether the employer made a reasonably informed and considered decision before taking an adverse employment action.'" *Id.* (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998)). "If there is no material dispute that the employer made a 'reasonably informed and considered decision' that demonstrates an

'honest belief' in the proffered reason for the adverse employment action, the case should be dismissed since no reasonable juror could find that the employer's adverse employment action was pretextual." *Id.*

Assuming that Hailes has made out prima facie case of retaliation, the VA argues that Kachaluba had a legitimate reason for her actions: Hailes's admitted refusal to follow Kachaluba's orders. Doc. 54-1, at 20. As the VA implies, insubordination is a legitimate, nondiscriminatory reason for an employer's actions. *See Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 651 (6th Cir. 2015); *Parries v. Makino, Inc.*, 148 F. App'x 291, 302 (6th Cir. 2005); *Suteerachanon v. McDonald's Restaurants of Maryland, Inc.*, No. 13-2889, 2014 WL 6674587, at *3 (D. Md. Nov. 24, 2014) (involving a plaintiff who "refus[ed] to follow a 'wrong order' of her supervisor"), *aff'd*, 607 F. App'x 339 (4th Cir. 2015).

Because the VA has offered a legitimate, nondiscriminatory motive for Kachaluba's actions, the burden shifts to Hailes to show pretext. Hailes, however, does not claim that (1) her insubordination had no basis in fact, (2) her insubordination did not, at least in part, motivate Kachaluba, or (3) her insubordination was not enough to motivate Kachaluba. *See* Doc. 56, at 10; *see also Bashaw*, 130 F.4th at 548 (explaining how a plaintiff can rebut an employer's stated basis for acting and show pretext). Rather, she points to her own testimony that "her refusal to follow directions" *was* part of Kachaluba's motivation. Doc. 56, at 10. But because "a single independent

nondiscriminatory reason for [an employer's] conduct, … can defeat a retaliation claim," *Bashaw*, 130 F.4th at 549, Hailes's argument in this regard merely serves to show that she cannot show pretext, *see id*. at 548 ("Even if … some [of the proffered] reasons [are] pretextual, if 'at least one other is not, the defendant employer is … entitled to summary judgment.'") (citation omitted).

Indeed, the problem for Hailes is that there is no dispute that Kachaluba actually believed that Hailes was insubordinate and accounted for that believed insubordination when rating Hailes.[14] In fact, *Hailes* repeatedly provided the best evidence that the VA's stated rational for her rating—insubordination in refusing to follow Kachaluba's instructions—was not a pretext. Kachaluba issued Hailes a Report of Contact in June 2021 for being insubordinate after multiple conversations about Hailes's failure to follow procedures. Doc. 52-4, at 2. Hailes later confirmed what Kachaluba reported. Hailes testified that Kachaluba gave her a Report of Contact "for not doing it the way [Kachaluba] verbally instructed [Hailes] to." Doc. 53-1, at 118. According to Hailes, she and Kachaluba "had multiple conversations … about [Hailes's] refusal to deviate from written [standard operating procedures] based on [Kachaluba's] instruction." *Id*. at 117. Hailes also admitted that Kachaluba came "to [Hailes] multiple times and t[old] [Hailes] not to do something, or" that Kachaluba "want[ed] [Hailes] to do it like this. *And*

---

[14] The parties' pretext arguments focus on Hailes's rating and ignore the January 2022 hallway incident. But the Court's analysis equally applies to that incident.

*multiple times [Hailes] did not follow her instructions* because," in Hailes view, Kachaluba was "asking [Hailes] to break the law." *Id.* (emphasis added); *see id.* at 118 ("I just didn't follow her commands to verbally deviate from" "the procedure"). And, according to Hailes, Kachaluba used the resulting disciplinary measures "to justify lowering [Hailes's] performance." *Id.* at 119.

Further, when Hailes contested her performance evaluation, she pointed to instances in which she and Kachaluba disagreed about their laboratory's procedures. Doc. 52-7, at 4–5. Hailes added that "when [she] [didn't] follow [Kachaluba's] verbal commands, [Kachaluba] add[ed] the reports as errors to lower [Hailes's] performance rating." *Id.* at 5.

In short, Hailes's own evidence shows that the reason for the VA's action was Hailes's actual or perceived insubordination. Far from showing that Kachaluba did not actually believe that Hailes was insubordinate, Hailes has supported the VA's position. *See* Doc. 56 at 10 (stating that alleged acts of retaliation "were tied to … the filling of her HPP complaint **and** … her refusal to follow instructions") (bolding in original).

Hailes appears to believe that because she justifiably—in her view—believed that Kachaluba's orders were unlawful, she could not have been insubordinate. Based on this premise, it appears that she posits that the VA's reason for Hailes's rating was a pretext. But Hailes misses the point. It doesn't matter whether she is right about the lawfulness of Kachaluba's orders. What matters is whether Hailes has shown that Kachaluba didn't actually believe

that Hailes was insubordinate. Given Hailes own testimony and the absence of any contrary evidence, there is no evidentiary basis to conclude or infer that Kachaluba did not honestly believe that Hailes was insubordinate.

Based on the premise that her allegedly lowered rating was tied to both her HPP complaint and her insubordination, Hailes says that "a reasonable jury could conclude that [the VA's] explanations were not the real reasons, were selectively enforced, or were insufficient to justify the challenged actions." Doc. 56, at 10. Other than saying it, however, Hailes offers no reason to believe that a jury could reach these conclusions. In fact, Hailes's own deposition testimony showed that (1) her own insubordination was the real reason for the VA's actions; and (2) Hailes's co-workers were not disciplined because, unlike Hailes, they were not insubordinate. And Hailes offers no basis to conclude that an employee's refusal to follow instructions is not an appropriate basis to discipline that employee. More importantly, Hailes's concession that one reason for her allegedly lowered rating was "her refusal to follow directions she believed were improper and could potentially harm patients," Doc. 56, at 10, "defeat[s] [her] retaliation claim." *Bashaw*, 130 F.4th at 548–49.

Because Hailes's own testimony shows that at least one reason for the VA's actions was not a pretext, there is no genuine issue of material fact on this issue. Hailes cannot prevail on her retaliation claim.

For all the reasons explained above, Hailes is not entitled to summary judgment, and the VA is entitled to summary judgment. *See Bashaw*, 130 F.4th at 548–49.

*3.2.6 Hailes's remaining arguments are misplaced*

Hailes claims that a co-worker was promoted in August 2021, despite a lack of relevant experience. Doc. 52, at 5. She also says that Kachaluba rated this co-worker as exceptional in all five rating elements and outstanding overall. *Id*. at 6. But Hailes doesn't explain what her co-worker's promotion and rating have to do with Hailes's retaliation claim. And she doesn't cite anything to support these assertions. So the Court does not consider them.

Hailes also faults the VA for not providing her with a free copy of her deposition transcript. Doc. 56, at 7. But she points to nothing that would have required the VA to do that. Indeed, "a mound of cases" stand for the proposition that Hailes is not entitled to a free copy of her deposition transcript. *Rodriquez v. Se. Pennsylvania Transp. Auth.*, No. 20-cv-3262, 2022 WL 17371059, at *1 n.2 (E.D. Pa. July 19, 2022) (citing cases); *see also Johnson v. Elum*, No. 4:20-cv-12422, 2022 WL 1205005, at *2 (E.D. Mich. Apr. 22, 2022); Fed. R. Civ. P. 30(f)(3) ("*When paid reasonable charges*, the [deposition] officer must furnish a copy of the transcript or recording to any party or the deponent.") (emphasis added). Hailes also omits that the VA filed Hailes's deposition on the docket on the same day that it moved for summary judgment. *See* Docs. 53, 53-1.

*4. Conclusion*

The Court grants VA's motion for summary judgment, Doc. 54, and denies Hailes's motion, Doc. 52.

It is so ordered.

Dated: August 28, 2026

*/s/ James E. Grimes Jr.*
James E. Grimes Jr.
U.S. Magistrate Judge